**Warren JOBSON, Plaintiff-Appellant,**

**v.**

**Frank R. HENNE, Edward D. Stevenson, Murray Bergman and Michael Semchyshyn, Defendants-Appellees.**

**No. 60, Docket 29780.**

United States Court of Appeals
Second Circuit.

Argued Oct. 20, 1965.

Decided Jan. 5, 1966.

A. E. Schulgasser, Leon I. Schulgasser, Buffalo, N. Y., for plaintiff-appellant.

Louis J. Lefkowitz, Atty. Gen. of State of New York; Samuel A. Hirshowitz, First Asst. Atty. Gen.; Mortimer Sattler, Herbert J. Wallenstein, Asst. Attys. Gen., New York City, for defendants-appellees.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge:

The plaintiff-appellant, Warren Jobson, was an inmate of the New York State Newark State School for Mental Defectives most of his life. He was first committed to it on August 27, 1935 when he was twelve years old. There he remained until he was placed on home convalescent care status in 1953. He was finally discharged on May 16, 1956, and shortly thereafter he apparently became associated with a group of boys who were engaged in various unlawful activities. He was soon arrested, was indicted, and pleaded guilty to the crimes of petty larceny and burglary in the third degree. Prior to sentence the charges were dropped, and twenty days after his discharge on June 5, 1956, the appellant was recertified to the Newark State School, where he remained until late in the year 1963.[1]

On November 18, 1963 the appellant filed a complaint in the United States District Court for the Western District of New York, naming the director of the Newark State School, two assistant directors, and the school's supervising psychiatrist as parties defendant. The complaint sought a judgment for money damages totaling $100,000, alleging, *inter alia*, that "the defendants for a period of many months last past have

1. In the reply brief for the plaintiff-appellant it is stated that the plaintiff no longer resides in a mental institution.

wilfully, intentionally and maliciously held the plaintiff in and to involuntary servitude, peonage and/or slavery in and in the vicinity of the Newark State School * * * " in violation of 42 U.S.C. § 1983, which reads as follows:

§ 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Federal jurisdiction was asserted under § 1983, 28 U.S.C. § 1343, and 28 U.S.C. § 1331.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure the defendants moved with supporting affidavits for summary judgment in their favor. The appellant served affidavits in opposition to the defendants' motion. Judge Henderson granted the motion in a brief opinion filed on March 26, 1965. He did not hold that summary judgment was proper because there was no genuine issue as to a material fact. Indeed, Judge Henderson noted that "on the present record * * * the court obviously cannot determine whether work assignments in any instance were excessive." Nevertheless, the lower court decided the defendants were entitled to judgment as a matter of law because they were state officials and entitled to invoke traditional judge-made doctrines of official immunity [2] in a suit brought against subordinate state officials to enforce the tort liability created by 42 U.S.C. § 1983.

At the outset it should be noted that what we say in this case on the subject of the protection afforded by the Thirteenth Amendment has no bearing on the legality of the imprisonment of persons duly convicted of a crime; such persons are explicitly excepted from the Amendment's coverage. United States ex rel. Smith v. Dowd, 271 F.2d 292 (7 Cir. 1959), cert. denied, 362 U.S. 978, 80 S.Ct. 1063, 4 L.Ed.2d 1013 (1960).

On a record so devoid of facts it is clearly impossible at this time to resolve the merits of appellant's constitutional claim that as an inmate at the Newark State School he was forced to work under conditions that were tantamount to slave labor. All we can now decide is whether, assuming that what the plaintiff alleges is provable, the complaint states a claim upon which relief can be granted. Cf. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). If it does not state such a claim the decision of the lower court can be affirmed on that ground. But if the complaint does state a claim upon which relief can be granted we must go on to decide whether the parties-defendant in this case, because of their offices, are immune from suit brought under § 1983.

Thus we turn to consider whether the complaint states a cause of action on which a court can grant relief. We assume that even though the purpose of the Thirteenth Amendment was to proscribe conditions of "enforced compulsory service of one to another," Hodges v. United States, 203 U.S. 1, 16, 27 S.Ct. 6, 8, 51 L.Ed. 65 (1906), the states are not thereby foreclosed from requiring that a lawfully committed inmate perform without compensation certain chores designed to reduce the financial burden placed on a state by its program of treatment for the mentally retarded, if the chores are reasonably related to a therapeutic program, or if not directly so related, chores of a normal house-

---

2. For a general discussion of the development and scope of common law notions of official immunity from actions for dam-ages see Hart & Wechsler, The Federal Courts and the Federal System, 1215–1224 (1953).

keeping type and kind.[3] Proceeding on this assumption it would seem to follow that those in control of institutions for the mentally retarded may subject inmates to a wide variety of programs with both therapeutic and cost saving purposes without violating the Thirteenth Amendment.[4] Nevertheless, there may be some mandatory programs so ruthless in the amount of work demanded, and in the conditions under which the work must be performed, and thus so devoid of therapeutic purpose, that a court justifiably could conclude that the inmate had been subjected to involuntary servitude. In the present case the appellant's supporting affidavits state that for long periods of time he was forced to work in the Newark State School's boiler house eight hours a night, six nights a week, while working eight hours a day at assigned jobs in the village of Newark.[5]

As we cannot say that any such work program would not go beyond the bounds permitted by the Thirteenth Amendment, the complaint states a claim under § 1983. We must therefore reverse the district court's grant of the motion for summary judgment unless we can conclude that the lower court correctly applied the defense of official immunity. This follows from the present posture of this case. The case comes up upon the district court's grant of the defendants' motion for summary judgment and in this context factual disputes must be resolved in the manner most

3. It seems established that compulsory commitment of mentally ill individuals who may be harmful to themselves or to society if allowed to remain at large does not violate the Thirteenth Amendment if the commitment procedures contain sufficient procedural safeguards. See People ex rel. Anonymous v. La Burt, 14 A.D.2d 560, 218 N.Y.S.2d 738 (App.Div.1961), motion for leave to appeal denied, 14 A.D. 2d 700, 219 N.Y.S.2d 948 (App.Div. 1961); State ex rel. Thompson v. Snell, 46 Wash. 327, 89 P. 931, 9 L.R.A.,N.S., 1191 (1907). See generally Note, 65 Colum.L.Rev. 1062, 1066–72 (1965). One can still argue, however, that to require inmates to perform cost saving (as distinguished from therapeutic) labor contravenes the Thirteenth Amendment. Indeed, one court apparently has so held. Stone v. City of Paducah, 120 Ky. 322, 86 S. W. 531 (Ky.Ct.App.1905); cf. Ex parte Lloyd, 13 F.Supp. 1005 (E.D.Ky.1936). Nevertheless, many states do administer programs that are designed to supply institutional needs as well as provide therapy, see Note, 110 U.Pa.L.Rev. 78, 89 (1961), and we assume that mental institutions can constitutionally require inmate participation in these programs to the extent that the programs have a therapeutic purpose, or are reasonably related to the inmate's housekeeping or personal hygienic needs. Therefore, whether an institution's required program in any given case constitutes involuntary servitude would seem to depend on the nature of the tasks that are required of the inmate. If a court can conclude that the chores are reasonably related to a therapeutic program or to the inmate's personal needs, the fact that the performance of the chores also assists in defraying the operating costs of the institution should not constitute involuntary servitude, even if inmates are required to engage in this activity. On the other hand, it would seem that the Thirteenth Amendment may be violated if a mental institution requires inmates to perform chores which have no therapeutic purpose or are not personally related, but are required to be performed solely in order to assist in the defraying of institutional costs, and it would appear that this would be so even if the inmates were compensated for their labor, for the mere payment of a compensation, unless the receipt of the compensation induces consent to the performance of the work, cannot serve to justify forced labor. See Taylor v. State of Georgia, 315 U.S. 25, 62 S.Ct. 415, 86 L.Ed. 615 (1942).

4. There is a sharp and obvious distinction between saying that within a broad spectrum of therapeutic and cost saving programs the Thirteenth Amendment is not violated, and saying that, because the parties defendant in this case had a discretion in their choice of program, they should be immune from a suit seeking to hold them liable for the consequences of the choice they in fact made.

5. In the brief for the plaintiff-appellant and in the supporting affidavit it is stated that the plaintiff was paid one cent an hour for his work in the boiler house and between thirty-seven and one-half cents and fifty cents an hour for the work he performed in the village of Newark, N. Y.

favorable to the party opposing the motion, here the plaintiff-appellant. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The fact that the trial court believed it unlikely that the plaintiff-appellant would prevail at trial is insufficient to authorize summary judgment against him. See National Screen Serv. Corp v. Poster Exch., Inc., 305 F.2d 647 (5 Cir. 1962). If we resolve the factual uncertainties in favor of the plaintiff-appellant, it is clear that he is entitled to a trial unless the doctrine of official immunity bars recovery.[6]

■ Thus we reach the question whether these defendants by reason of their offices should be immune from the tort liability imposed by § 1983. The Civil Rights Acts in general,[7] and § 1983 in particular, are cast in terms so broad as to suggest that in suits brought under these sections common law doctrines of immunity can never be a bar. Nevertheless, courts have narrowed the scope of these provisions by applying certain common law notions of official immunity from suit; it is now clear, for example, that the common law immunity from suit afforded legislative[8] and judicial[9] officers continues to have force in suits brought under the Civil Rights provisions. See generally, Note, The Doctrine of Official Immunity Under the Civil Rights Acts, 68 Harv.L.Rev. 1229 (1955).

■ It should be equally clear that both the language and the purpose of the Civil Rights Acts are inconsistent with the application of common law notions of official immunity in all suits brought under these provisions. See Norton v. McShane, 332 F.2d 855, 861 (5 Cir. 1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965). In suits brought under § 1983 an indispensable element of a plaintiff's case is a showing that the defendant (or defendants) acted "under color of any statute, ordinance, regulation, custom, or usage, of any State * * *." 42 U.S. C. § 1983. This test can rarely be satisfied in the case of anyone other than a state official. See Collins v. Hardyman, 341 U.S. 651, 662, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). To hold that all state officials in suits brought under § 1983 enjoy an immunity similar to that they might enjoy in suits brought under state law "would practically constitute a judicial repeal of the Civil Rights Acts." Hoffman v. Halden, 268 F.2d 280, 300 (9 Cir. 1959). Furthermore, and perhaps more basically, the purpose of § 1983 as well as the other Civil Rights provisions is to provide a federal remedy for the deprivation of federally guaranteed rights in order to enforce more perfectly federal limitations on unconstitutional state action. To hold all state officers immune from suit would very largely frustrate the salutary purpose of this provision.[10] We conclude the defense of official immunity

---

6. As I understand the dissent, it argues that the defense affidavits, which stated that the work assignments benefited the appellant, provided the district court with a sufficient ground on which to hold that the defendants were immune from suit. The difficulty with that view, in this case, is that many of the facts relating to the work required of the appellant during his confinement are uncertain and the plaintiff is entitled to a trial on the issue of what was, in fact, required of him. We do not decide whether, when there is no uncertainty about what transpired, it may be sufficient for a defendant psychiatrist to show by affidavit that there was professional opinion supporting what he did.

7. 42 U.S.C. §§ 1981–93. These provisions originated in the Reconstruction Enforcement Acts: Act of April 9, 1866, 14 Stat. 27; Act of May 31, 1870, 16 Stat. 140; Act of Feb. 28, 1871, 16 Stat. 433; Act of April 20, 1871, 17 Stat. 13; and Act of March 1, 1875, 18 Stat. 335.

8. See Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

9. See, e. g., Kenney v. Fox, 232 F.2d 288 (6 Cir.), cert. denied 352 U.S. 855, 77 S. Ct. 84, 1 L.Ed.2d 66 (1956).

10. We do not intend to suggest that Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) was wrongly decided, but only that the rationale of that

should be applied sparingly in suits brought under § 1983. Cf. Robichaud v. Ronan, 351 F.2d 533 (9 Cir. 1965).

 In holding that the defense of official immunity could be invoked by the parties-defendant in the present case the lower court relied on the decision of the First Circuit in Francis v. Lyman, 216 F.2d 583 (1 Cir. 1954). In that case the plaintiff, released from a correction home on habeas corpus after having been committed under a statute not providing for a proper hearing, brought suit under an analogue of § 1983 seeking to recover from the wardens who had incarcerated him under a judicial warrant valid on its face. In dismissing the complaint on the ground that the named defendants were immune from suit, the First Circuit emphasized that none of the defendants had the lawful power to refuse to confine the plaintiff nor could they be viewed as having "caused" the unconstitutional confinement. In sharp contrast, in the present case the defendants are the very parties who imposed the work program, which it is claimed ruthlessly violated the plaintiff-appellant's constitutional rights. The defendants had the power to alter this program; in a real sense they can be said to have "caused" the conditions under which the appellant labored. We hold that in such circumstances the defendants are liable to suit under § 1983 even though they are state administrative officials.[11]

Reversed and remanded for trial.

MOORE, Circuit Judge (dissenting):

The plaintiff, Warren Jobson, is a mental defective who has spent most of his adult life in state schools for the men-

tally defective. He was committed at the age of 12, at which time he had an I.Q. of 50 and a mental age of six and one-half years. After some improvement he was discharged in May 1956, but was recertified to the Newark [New York] State School for Mental Defectives on June 5, 1956, after he had been arrested and had pleaded guilty to charges of petty larceny and burglary in the third degree. Tests at the time of readmission indicated an I.Q. of 67; tests in 1963 indicated an I.Q. of 58. At present, Jobson appears to be supporting himself outside of the state mental institutions.

While at the Newark School, Jobson often worked at night in the boiler room, sometimes six nights a week, eight hours a night. In addition he did jobs about the community at wages fixed by the school. In November 1963, he brought suit in the Western District of New York against the director of the Newark School, two assistant directors, and a supervising psychiatrist, under 42 U.S.C. § 1983, alleging that he had been deprived of his civil rights by defendants, having been held by them in involuntary servitude, slavery, or peonage, and seeking $100,000 in damages. The trial court granted defendant's motion for summary judgment, holding defendants immune from suit in light of the need for "effective administration of the state's program for mental defectives and the effect that the fear of constant and vexatious suits may have upon persons charged with its administration." From this judgment, plaintiff appeals.

The scope of the doctrine of official immunity to suit under the civil rights acts has never been well defined, perhaps

decision should not be extended to suits against state administrative officials.

11. The suggestion in the dissent that the cases under § 1983 involving treatment of mental defectives support the decision of the lower court should not go unchallenged. As has been noted in the body of this opinion, Francis v. Lyman, 216 F.2d 583 (1 Cir. 1954) is distinguishable. Hoffman v. Halden, 268 F.2d 280 (9 Cir. 1959), in part simply followed Francis v. Lyman, supra. And, if Hoffman also

stands for the proposition that in suits under § 1983 all subordinate state officials should be granted an immunity for all discretionary acts the decision should be disapproved. See text accompanying note 10 supra. Duzynski v. Nosal, 324 F.2d 924 (7 Cir. 963), and Campbell v. Glenwood Hills Hospital, Inc., 224 F.Supp. 27 (D.Minn.1963), also cited in the dissent, apparently turn on the absence of state action, a ground of decision obviously not available to state employed psychiatrists.

because of the difficulty in reconciling the conflicting interests at stake, namely:

> \* \* \* the protection of the individual citizen against damage caused by oppressive or malicious action on the part of public officers, and the protection of the public interest by shielding responsible governmental officers against the harassment \* \* \* of vindictive or ill-founded damage suits based on acts done in the exercise of their official responsibilities.

Norton v. McShane, 332 F.2d 855, 857 (5th Cir. 1964).

In the present case, defendants assert the state interest in being free to experiment in the therapeutic treatment of mental defectives; plaintiff asserts the need for some judicial review. Although to hold state psychiatrists absolutely immune from suit upon any state of facts might leave persons in the position of plaintiff without any means of securing judicial review, in the case now before us the allegations of the complaint and the affidavits on defendants' motion for summary judgment show clearly that defendants were acting within their discretion in their assignment of work to the plaintiff. In support of their motion for summary judgment, defendants submitted expert opinions indicating that the work was beneficial to plaintiff and had therapeutic value; in opposition to defendant's motion, plaintiff produced expert opinions that the work assignments were without therapeutic value. I would uphold the dismissal, interpreting Judge Henderson's decision not as holding that state psychiatrists are absolutely immune from suit under § 1983, but as holding that, as a matter of law, in light of the need to permit considerable flexibility in state treatment of mental defectives, plaintiff has failed to allege or show facts sufficient to constitute a cause of action under § 1983.

Such cases as there are on the subject support the action of the trial judge. To be sure, those cases upholding the dismissal of § 1983 actions against legislators, e. g., Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and against judges, e. g., Arnold v. Bostwick, 339 F.2d 879 (9th Cir. 1964), may be distinguished from the present problem on the grounds of traditional desire to keep legislative discussion and judicial discretion *absolutely* untrammeled by fear of private damage actions.

However, the few cases under § 1983 involving treatment of insane persons or mental defectives strongly support the trial judge's decision. In Francis v. Lyman, 216 F.2d 583 (1st Cir. 1954), the First Circuit upheld the dismissal of an action against various officials responsible for the confinement of the plaintiff in a mental institution. The statute under which plaintiff had been confined had been held in a prior habeas corpus proceeding to violate due process by failing to provide opportunity for a fair hearing. The case holds only that officials of a mental institution cannot be held responsible for any lack of due process in the judicial commitment proceedings; but the court in broad dicta indicated a desire to restrict § 1983 to cases of racial discrimination. Still more in point is Hoffman v. Halden, 268 F.2d 280 (9th Cir. 1959), in which the plaintiff alleged that the superintendent of the state mental hospital improperly failed to release the plaintiff, although he had the power to order the plaintiff's release. The court upheld the dismissal of the action against the superintendent on the grounds that the superintendent's power was discretionary, and he should be immune from civil suits based upon the exercise of a discretionary function. See also Campbell v. Glenwood Hills Hospital, Inc., 224 F.Supp. 27 (D.Minn.1963), in which the court dismissed an action based in part upon improper treatment of a mental patient after confinement, and Duzynski v. Nosal, 324 F.2d 924 (7th Cir. 1963), upholding dismissal of a § 1983 complaint based upon abuse of discretion on the part of the committing doctor.

For general discussions of the problem of official immunity and § 1983, see Note, The Civil Rights Act of 1871; Continuing Vitality, 40 Notre Dame Law. 70, 75–77 (1964); Note, Civil Rights Act Section 1983: Abuses by Law Enforcement Officers, 36 Ind.L.J. 317 (1961); Comment, Civil Liability of Subordinate State Officials Under the Federal Civil Rights Act and the Doctrine of Official Immunity, 44 Calif.L. Rev. 887 (1956); Note, The Doctrine of Official Immunity Under the Civil Rights Acts, 68 Harv.L.Rev. 1229 (1955); Note, The Proper Scope of the Civil Rights Acts, 66 Harv.L.Rev. 1285, 1295–99 (1953).

The reluctance of the courts to entertain actions of this sort is understandable. State psychiatrists need scope in their attempts to treat mental defectives, and courts have enough to do without practicing psychiatry. Only when a course of treatment is prescribed which cannot reasonably be defended as therapeutic should a suit of this type be able to withstand a defense motion for summary judgment. This is not such a case. I would affirm.